IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

NORMAN CLARK GANGL (AIS# 149515)　　　\*
　　　　　　　　　　　　　　　　　　　　\*
　　　　Plaintiff,　　　　　　　　　　　　\*
　　　　　　　　　　　　　　　　　　　　\*
v.　　　　　　　　　　　　　　　　　　　\*　　CASE NO. 2:07-CV-350-WHA
　　　　　　　　　　　　　　　　　　　　\*
COMMISSIONER[S] CAMPBELL, et al.　　　\*
　　　　　　　　　　　　　　　　　　　　\*
　　　　Defendants.　　　　　　　　　　　\*

## SPECIAL REPORT OF DEFENDANTS PRISON
## HEALTH SERVICES, INC. AND JOHN PEASANT, M.D.

COME NOW the Defendants, Prison Health Services, Inc. (hereinafter "PHS") and John Peasant, M.D., by and through counsel, and in response to the Plaintiff's Complaint and this Court's Order, present the following Special Report with regard to this matter.

## I. INTRODUCTION

The Plaintiff, Norman Clark Gangl (AIS# 149515), is currently confined at Ventress Correctional Facility in Barbour County, Alabama. On or about May 14, 2007, Gangl filed a multi-count Complaint against numerous defendants, including the following:

1.　　Commissioner Campbell
2.　　Commissioner Richard Allen
3.　　Barbour County, Alabama
4.　　Alabama Department of Corrections
5.　　President George W. Bush
6.　　Dr. John Peasant

PHS is the company that currently contracts with the Alabama Department of Corrections to provide healthcare services for inmates housed within Alabama's

correctional facilities. No claim is asserted against PHS, however, Dr. John Peasant is an employee of PHS and, thus, PHS will file this Special Report on his behalf.

In his Complaint, Gangl asserts the following general claims against the various Defendants:

1.    Cruel and unusual punishment due to overcrowding.

2.    Failure to comply with federal orders regarding overcrowding.

3.    Undefined claims against the State for "frivolous attempts to relieve overcrowding."

4.    A claim against Barbour County for failing to close Ventress Correctional Facility when its population became excessive.

5.    A claim against Dr. Peasant concerning medication Dr. Peasant ordered for Gangl relating to his tuberculosis condition.

Gangl seeks the following relief relating to his claims:

1.    Pay for all medical costs.

2.    Give Plaintiff five days credit for every day served since September 1, 2002.

3.    Pay punitive damages for TB, Hepatitis C, and skin staph infection.

4.    Pay $1,000 for every day Plaintiff is being forced to take medicine against his will.

5.    Appoint an attorney so that the matter can go to trial.

As directed, PHS and Dr. Peasant have undertaken an extensive review and investigation of the claims outlined in Gangl's Complaint. As a result of this investigation, the Defendants are submitting this Special Report with appropriate evidentiary materials, including (1) Prisoner Gangl's medical records [Exhibit "A"], (2) Affidavit of Dr. John Peasant [Exhibit "B"], (3) Affidavit of Nettie Burks [Exhibit "C"],

and (4) grievance procedures pertaining to Ventress Correctional Facility [Exhibit "D"]. These evidentiary materials demonstrate conclusively that Plaintiff Gangl has been provided appropriate medical treatment for his complaints and that Dr. Peasant has not demonstrated any "deliberate indifference to a serious medical need" or violated any standard of care, pursuant to the Alabama Medical Liability Act.  In fact, Dr. Peasant's prescription for medications necessary to treat Gangl for tuberculosis have, in fact, helped Gangl's physical condition, despite the allegations contained in his Complaint. As such, the allegations in the Complaint are without merit.

## II. NARRATIVE SUMMARY OF FACTS

As stated earlier, Gangl has been incarcerated at Ventress Correctional Facility during the entire period outlined in his Complaint (March 2007 to present).  [See Plaintiff's Complaint, I and IV].  Gangl has been seen and evaluated by Ventress's medical and nursing staff and, specifically, Dr. John Peasant.

Gangl is enrolled in the chronic care clinic at Ventress Correctional Facility for symptoms relating to Hepatitis C and tuberculosis.  [Exhibit "B" -- Affidavit of Dr. John Peasant].  Gangl was regularly seen and evaluated in the clinic by Dr. Peasant and has had numerous follow-up appointments.  [Id.].  Gangl has a medical history significant for Hepatitis C but, although he tested positive for the disease, he did not meet the required criteria for treating the condition.  In March 2007, Gangl also tested positive for tuberculosis and was started on daily doses of Rifampin beginning on March 27, 2007. [Id.].  Rifampin eliminates the bacteria that causes tuberculosis and it is a required treatment for the disease.

On or about March 20, 2007, Dr. Peasant diagnosed Gangl as having contracted tuberculosis during an annual yearly health evaluation. [Exhibit "A" - Gangl Medical Records]. Prior yearly evaluations in March 2006 and March 2005 did not reveal this condition. [Id.]. Doctor's notes from March 27th verify the condition and show that Dr. Peasant correctly ordered the Rifampin medication. [Id.]. Additional diagnostic tests were also ordered, which confirmed this diagnosis. [Id.]. Since this diagnosis, prescription charts verify that Rifampin has been ordered and prescribed for Gangl on a daily basis, despite his repeated complaints. [Id.]. The complaints outlined in Gangl's pleading are also supported by multiple examples of Gangl's refusal to submit to proper medical treatment. [Id.].

In April 2007 and early May 2007, Gangl received treatment in the INH/Active TB clinic, according to medical records contained in this file. [Id.]. During each of these visits, PHS personnel and Dr. Peasant examined Gangl and properly treated his tuberculosis condition. [Id.].

Prior to initiating this litigation, Mr. Gangl knew about internal grievance procedures concerning medical conditions. [Exhibit "C" -- Affidavit of Nettie Burks, H.S.A.]. PHS has established a two-step procedure for identifying, and addressing inmate grievances at Ventress Correctional Facility. [Id.]. Should an inmate like Mr. Gangl have a grievance regarding a healthcare issue, he must submit a grievance form to the unit. These forms are available for any prisoner to access and complete. This form allows communication to exist between the inmate and the healthcare provider and to address problems the inmates believe may exist pertaining to their medical care. [Id.].

If an inmate is unsatisfied with the initial response, a Grievance Appeal Form may be requested and completed in the healthcare unit. [Id.]. This form allows an inmate to voice his concerns regarding the healthcare issue and allows PHS to review the situation and discuss the appropriate medical care. Here, however, Gangl did not file the appropriate Informal Grievance Procedure form relating to medical care for this alleged condition. [Id.].

## III. **DEFENSES**

The Defendants assert the following defenses to the Plaintiff's claims:

1.     The Plaintiff/prisoner failed to comply with the mandatory requirements of the Prison Litigation Reform Act of 1995, 42 U.S.C. §1997(e), et seq. ("PLRA") and the PLRA directly applies to require that this matter be dismissed with prejudice for failing to comply with the terms and conditions of grievance procedures concerning medical issues.

2.     The Defendants deny each and every material allegation contained in the Plaintiff's Complaint and demand strict proof thereof.

3.     The Defendants plead not guilty to the charges in the Plaintiff's Complaint.

4.     The Plaintiff's Complaint fails to state a claim against the Defendants for which relief can be granted.

5.     The Defendants affirmatively deny any and all alleged claims by the Plaintiff.

6.     The Plaintiff is not entitled to any relief requested in the Complaint.

7.    The Defendants plead the defense of qualified immunity and aver that the actions taken by the Defendants was reasonable and in good faith with reference to clearly established law at the time of the incidents complained of by the Plaintiff.

8.    The Defendants are entitled to qualified immunity and it is clear from the face of the Complaint that the Plaintiff has not alleged specific facts indicating that the Defendants have violated any clearly established constitutional right.

9.    The Defendants cannot be held liable on the basis of respondeat superior, agency, or vicarious liability theories.

10.    The Plaintiff is not entitled to any relief under 42 U.S.C. § 1983.

11.    The allegations contained in the Plaintiff's Complaint against the Defendant, Dr. John Peasant, sued in his individual capacity, fails to comply with the heightened specificity requirement of Rule 8 in § 1983 cases against persons sued in their individual capacities. See Oladeinde v. City of Birmingham, 963 F.2d 1481, 1485 (11th Cir. 1992); Arnold v. Board of Educ. Of Escambia County, 880 F.2d 305, 309 (11th Cir. 1989).

12.    The Defendants plead all applicable immunities, including, but not limited to qualified, absolute, discretionary function immunity, and state agent immunity.

13.    The Defendants aver that they were, at all times, acting under color of state law and, therefore, they are entitled to substantive immunity under the law of the State of Alabama.

14.    The Defendants plead the general issue.

15.    This Court lacks subject matter jurisdiction due to the fact that even if the Plaintiff's allegations should be proven, the allegations against the Defendants would

amount to mere negligence which is not recognized as a deprivation of the Plaintiff's constitutional rights. See Rogers v. Evans, 792 F.2d 1052 (11th Cir. 1986).

16.   The Plaintiff's claims against the Defendant, Dr. John Peasant, in his official capacity are barred by the Eleventh Amendment to the United States Constitution.

17.   Alabama law provides tort and other remedies for the allegations made by the Plaintiff herein and such remedies are constitutionally adequate.

18.   The Defendants plead the defense that at all times in treating Plaintiff it exercised the same degree of care, skill, and diligence as other physicians and nursing staff would have exercised under similar circumstances and that at no time did they act toward the Plaintiff with deliberate indifference to a serious medical need.

19.   The Defendants plead the affirmative defense that the Plaintiff's Complaint fails to contain a detailed specification and factual description of the acts and omissions alleged to render them liable to the Plaintiff as required by § 6-5-551 of the Ala. Code (1993).

20.   The Defendants plead the affirmative defenses of contributory negligence and assumption of the risk.

21.   The Defendants plead the affirmative defense that Plaintiff's damages, if any, were the result of an independent, efficient, and/or intervening cause.

22.   The Defendants plead the affirmative defense that it is not responsible for the policies and procedures of the Alabama Department of Corrections.

23.   The Defendants plead the affirmative defense that the Plaintiff has failed to mitigate his own damages.

24.    The Defendants plead the affirmative defense that they are not guilty of any conduct which would justify the imposition of punitive damages against him and that any such award would violate the United States Constitution.

25.    The Defendants adopt and assert all defenses set forth in the Alabama Medical Liability Act § 6-5-481, et seq., and § 6-5-542, et seq.

26.    The Plaintiff has failed to comply with 28 U.S.C. § 1915 with respect to the requirements and limitations inmates must follow in filing in forma pauperis actions in federal court.

27.    Pursuant to 28 U.S.C. § 1915 A, this Court is requested to screen and dismiss this case, as soon as possible, either before or after docketing, as this case is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks money damages from the Defendant, Dr. John Peasant, who is a state officer entitled to immunity as provided for in 42 U.S.C. § 1997 (e)(c).

28.    The Defendants assert that the Plaintiff's Complaint is frivolous and filed in bad faith solely for the purpose of harassment and intimidation and requests this Court pursuant to 42 U.S.C. § 1988 to award Defendants reasonable attorney's fees and costs incurred in the defense of this case.

29.    The Plaintiff's claims are moot because the events which underlie the controversy have been resolved. See Marie v. Nickels, 70 F., Supp. 2d 1252 (D. Kan. 1999).

## IV. ARGUMENT

**A.**    **Because Gangl Failed to Follow the Required Grievance Procedures for Assessing Medical Complaints Prior to Filing His Lawsuit, the Prison Litigation Reform Act of 1995 Requires the Immediate Dismissal, with Prejudice, of His Complaint..**

Congress passed the Prison Litigation Reform Act of 1995 ("PLRA") in order to control frivolous prisoner lawsuits.  The Act contains multiple, mandatory provisions that require the dismissal of complaints identical to those asserted by Mr. Gangl.

The PLRA defines a prisoner as follows:

> As used in this section, the term "prisoner" means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program.  42 U.S.C. §1997e(h).

Gangl admits to being incarcerated in his complaint, therefore, he meets the definition of "prisoner" as defined by the PLRA.  See Boyd v. Corrections Corporation of America, 380 F.3d 989 (6th Cir. 2004).

The crux of the PLRA requires a prisoner to exhaust all internal, administrative remedies prior to filing suit.  The PLRA requires that the Court on its motion or the motion of a defendant dismiss any action with respect to prisoner conditions or medical treatment upon failure to exhaust these remedies.  42 U.S.C. §1997e(a).  This provision states the following:

> **(a)    Applicability of Administrative Remedies.**
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.  (emphasis added).

9

**(b)    Failure of State to Adopt or Adhere to Administrative Grievance Procedure.**
The failure of a State to adopt or adhere to an administrative grievance procedure shall not constitute the basis for an action under 1997a or 1997c of this Title.

**(c)    Dismissal**
The Court shall on its own motion or on the motion of a party dismiss any action brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility if the court is satisfied that the action is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief.

42 U.S.C. § 1997e(a)

"Administrative remedies" pursuant to this Act constitute prison or jail grievance procedures such as those identified in this Special Report. Before filing suit, the prison/plaintiff must submit his claim through this procedure and the grievance must address the specific issue upon which the suit is based. Failure to strictly follow these procedures requires dismissal of the action. Even if the prisoner/plaintiff has no knowledge regarding the existence of the procedures, this does not relieve the requirement. See Zolicoffer v. Scott, 55 F. Supp. 2d 1372 (N.D. Ga. 1999), affirmed without opinion (252 F.3d 440 (11th Cir. 2001).

In this particular case, Gangl failed to follow available, required administrative procedures that existed within the Ventress Correctional Facility. [Exhibit "C" – Affidavit of Nettie Burks, H.S.A.]. These procedures required Gangl to seek administrative relief of his claim before seeking court intervention regarding his claim. His failure to follow these internal procedures concerning his medical grievances require his claim be dismissed with prejudice. Woodford v. NGO, 126 S. Ct. 2378, 165 L.Ed.2d 368 (2006).

The Woodford case is extremely instructive because the United States Supreme Court took the opportunity to clarify issues concerning the Prison Litigation Reform Act. In Woodford, a California state prisoner challenged a disciplinary act but did so in an untimely manner, violating California's Prison Grievance System. Subsequently, the prisoner sued the system in federal court, but the district court granted the Department's Motion to Dismiss, stating the prisoner had not fully exhausted his administrative remedies, pursuant to the Prison Litigation Reform Act. On appeal, the Ninth Circuit reversed, claiming that because no administrative remedies remained available to the prisoner, he had "not exhausted them" amongst other reasons.

On appeal, the United States Supreme Court reversed the Ninth Circuit and affirmed the dismissal of the prisoner's complaint. The Court's opinion focused extensively on the "exhaustion" of available remedies and concluded that whether procedural deficiencies existed or whether a prisoner is poorly educated and unfamiliar with such proceedings, it is a requirement that administrative remedies be followed prior to litigation ensuing in federal court. Id. At 2387, 2388, 2390, 2392-2393.

Gangl's case is no different from that outlined in Woodford. Gangl must exhaust internal, administrative remedies before seeking redress for his complaints within the legal system. Adhering to these procedures serves a two-fold interest, (1) it allows Gangl the opportunity to advise correctional officers or healthcare employees regarding his concerns and (2) it permits internal procedures to address and alleviate concerns raised by prisoners through this process. More importantly, it eliminates frivolous litigation by giving both the prisoner and the correctional facility the opportunity to be aware of complaints and address them prior to the expense of litigation.

**B.**    **The Plaintiff has failed to prove that the Defendants acted with deliberate indifference to any serious medical need.**

A court may dismiss a complaint for failure to state a claim if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations in the complaint. Romero v. City of Clanton, 220 F. Supp. 2d 1313, 1315 (M.D. Ala., 2002), (citing, Hishon v. King & Spalding, 467 U.S. 69, 73, (1984). "Procedures exist, including Federal Rule of Civil Procedure 7(a), or Rule 12(e), whereby the trial court may "protect the substance of qualified immunity," Shows v. Morgan, 40 F. Supp. 2d 1345, 1358 (M.D. Ala., 1999). A careful review of Gangl's medical records reveals that he has been given appropriate medical treatment at all times. [See Exhibits "A" & "B"].

The Plaintiff's Complaint fails to state a claim against the Defendants with the detail and specificity required by the Alabama Medical Liability Act, ALA. CODE § 6-5-551, which provides as follows:

> In any action for injury, damages, or wrongful death, whether in contract or tort, against a health care provider for breach of the standard of care, whether resulting from acts or omissions in providing health care, or the hiring, training, supervision, retention or termination of care givers, the Alabama Medical Liability Act shall govern the parameters of discovery and all aspects of the action. The plaintiff shall include in the complaint filed in the action a detailed specification and factual description of each act and omission alleged by plaintiff to render the health care provider liable to plaintiff and shall include when feasible and ascertainable the date, time, and place of the act or acts. The plaintiff shall amend his complaint timely upon ascertainment of new or different acts or omissions upon which his claim is based; provided, however, that any such amendment must be made at least 90 days before trial. Any complaint which fails to include such detailed specification and factual description of each act and omission shall be subject to dismissal for failure to state a claim upon which relief may be granted. Any party shall be prohibited from conducting discovery

with regard to any other act or omission or from introducing at trial evidence of any other act or omission. (emphasis added).

ALA. CODE § 6-5-551.

The Plaintiff's Complaint fails to state a claim against the Defendants because it fails to include a "detailed specification and factual description" of each act and omission alleged by Plaintiff to render the Defendants liable to Plaintiff; in particular, said Complaint fails to include the required statement of "the date, time, and place of the act or acts" of alleged malpractice, as required by the Act. See ALA. CODE § 6-5-551 (emphasis added).

What is even more unusual about Gangl's Complaint is that it directly attempts to prevent PHS employees and Dr. Peasant from providing needed, required medication for Gangl's tuberculosis condition. It seems difficult, if not impossible, to imagine circumstances wherein a physician prescribes needed medication and such "actions" constitute "deliberate indifference to a serious medical need" or a "factual description" sufficient to state a claim under the Alabama Medical Liability Act.

In order to state a cognizable claim under the Eighth Amendment, Gangl must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. See Estelle v. Gamble, 429 U.S. 97, 106 (U.S. 1976); McElligott v. Foley, 182 F.3d 1248, 1254 (11th Cir. 1999); Palermo v. Corr. Med. Servs., 148 F. Supp. 2d 1340, 1342 (S.D. Fla. 2001). In order to prevail, Gangl must allege and prove that he suffered from a serious medical need, that the Defendant was deliberately indifferent to his needs, and that he suffered harm due to deliberate indifference. See Marsh v. Butler County, 268 F.3d 1014, 1058 (11th Cir. 2001) and Palermo, 148

13

F. Supp. 2d at 1342. "Neither inadvertent failure to provide adequate medical care nor a physician's negligence in diagnosing or treating a medical condition states a valid claim of medical mistreatment under the Eighth Amendment." (citations omitted). [Id.].

Not every claim by a prisoner that medical treatment has been inadequate states an Eighth Amendment violation. Alleged negligent conduct with regard to inmates' serious medical conditions does not rise to the level of a constitutional violation. Alleged medical malpractice does not become a constitutional violation merely because the alleged victim is a prisoner. See Estelle, 429 U.S. at 106, McElligott, 182 F.3d at 1254, Hill, 40 F.3d 1176, 1186 (11th Cir. 1994), Palermo, 148 F. Supp. 2d at 1342. Here, the alleged "malpractice" could only be Dr. Peasant's insistence that Gangl take required medication to treat an active tuberculosis condition. Were the condition to go untreated by medication, Gangl's physical condition could deteriorate rapidly and other prisoners could be exposed to the condition. It is inconceivable that a physician in the position of Dr. Peasant would refuse to provide a patient with the appropriate medication.

The Defendants may only be liable if they had knowledge of Gangl's medical condition, Hill, 40 F. 3d at 1191, and acted intentionally or recklessly to deny or delay access to his care, or to interfere with treatment once prescribed. Estelle, 429 U.S. at 104-105. Obviously, Gangl cannot carry his burden. The evidence submitted with this Special Report clearly shows that the Defendant did not act intentionally or recklessly to deny or delay medical care, or to interfere with any treatment which was prescribed or directed. In fact, the evidence demonstrates that Gangl's condition -- Hepatitis C and tuberculosis -- was properly identified and treated by PHS physician, Dr. John Peasant.

Peasant's insistence that Gangl received the appropriate medication could not, under any imaginable circumstances, constitute deliberate indifference to a serious medical need.

The Defendants are, also, entitled to qualified immunity from all claims asserted by Gangl in this action. There is no argument that the Defendants were not acting within the scope of their discretionary authority. See Eubanks v. Gerwen, 40 F. 3d 1157, 1160 (11th Cir. 1994); see also Jordan v. Doe, 38 F. 3d 1559, 1566 (11th Cir. 1994). Because the Defendants have demonstrated that they were acting within the scope of their discretionary authority, the burden shifts to Gangl to show that the Defendant violated clearly established law based upon objective standards. Eubanks, 40 F. 3d at 1160. The Eleventh Circuit requires that before the Defendants' actions can be said to have violated clearly established constitutional rights, Gangl must show that the right allegedly violated was clearly established in a fact-specific, particularized sense. Edwards v. Gilbert, 867 F.2d 1271, 1273 (11th Cir. 1989), aff'd in pertinent part, rev'd in part on other grounds, sub nom., Edwards v. Okaloosa County, 5 F. 3d 1431 (11th Cir. 1989).

The Eleventh Circuit further requires that the inquiry be fact specific, and that officials will be immune from suit if the law with respect to their actions was unclear at the time the cause of action arose, or if a reasonable person could have believed that their actions were lawful in light of clearly established law and information possessed by the individual. See Brescher v. Von Stein, 904 F.2d 572, 579 (11th Cir. 1990) (quoting, Anderson v. Creighton, 483 U.S. 635, 640, (U. S. 1987)). The question that must be asked is whether the state of the law in 2006 gave the Defendants fair warning that its

15

alleged treatment of Gangl was unconstitutional. Hope v. Pelzer, 536 U.S. 730, 741 (U.S. 2002).

Therefore, to defeat summary judgment, Gangl must be able to point to cases with "materially similar" facts, within the Eleventh Circuit, that would alert the Defendant sto the fact that their practice or policy violates his constitutional rights. See Hansen v. Soldenwagner, 19 F.3d 573, 576 (11th Cir. 1994). In order for qualified immunity to be defeated, preexisting law must "dictate, that is truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." Lassiter v. Alabama A & M Univ., Bd. of Trustees, 28 F. 3d 1146, 1151 (11th Cir. 1994). The Defendants submit that there is no case law from the United States Supreme Court, the Eleventh Circuit Court of Appeals, or District Courts sitting within the Eleventh Circuit showing that, under the facts of this case, it was clearly established that these alleged actions violated Gangl's constitutional rights. All of Gangl's medical needs have been addressed or treated. [See Exhibits "A" & "B"]. The Defendants have provided Gangl with appropriate medical care at all times and he has received appropriate nursing care as indicated for treatment of his condition.

## V. CONCLUSION

Norman Gangl alleges in his Complaint that Dr. John Peasant should be civilly liable for requiring him to take necessary tuberculosis medication. Such allegations could not, and do not, rise to the level of deliberate indifference to a serious medical need nor do they constitute a violation of the Alabama Medical Liability Act. What they

do demonstrate, however, is the need for cases to be dismissed <u>with prejudice</u> for failing to comply with the Prison Litigation Reform Act. If any case pending before this Court is as frivolous as Mr. Gangl's, one could hardly imagine the nature of those complaints.

For the reasons set out herein and, based on the undisputed evidence in the record, these Defendants would respectfully request that Gangl's claim be dismissed, with prejudice.

Respectfully submitted,

/s/ PAUL M. JAMES, JR.
Alabama State Bar Number JAM017
Attorney for Defendants, Prison Health
Services, Inc. and John Peasant, M.D.
RUSHTON, STAKELY, JOHNSTON &
GARRETT, P.A.
P. O. Box 270
Montgomery, AL 36101-0270
Telephone: (334) 206-3148
Fax: (334) 262-6277
E-mail: pmj@rsjg.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served by U.S. Mail this the 15th day of August, 2007, to:

Mr. Norman Clark Gangl (AIS # 149515)
Ventress Correctional Facility
P. O. Box 767
Clayton, AL 36016

/s/ PAUL M. JAMES, JR. (JAM017)
Attorney for Defendants, Prison Health
Services, Inc. and John Peasant, M.D.

# EXHIBIT A



PRISON HEALTH SERVICES, INC.

# YEARLY HEALTH EVALUATION

| I. | HISTORY – (LPN or RN) | YES | NO | COMMENT(S) |
|---|---|---|---|---|

222  3-14-06
~~205~~
Last weight at least 6 months ago

Weight Change (greater 15 lbs.)   ✓ (crt)
(Compare Weight Below)
Persistent Cough   ✓
Chest Pain   ✓
Blood in Urine or Stool   ✓
Difficult Urination   ✓
Other Illnesses (Details)   ✓
Smoke, Dip or Chew   ✓
ALLERGIES   ✓

Weight 2/8  Temp 97⁸  Height 5'10 Pulse 6/  Resp 20  Blood Pressure 140/100

If greater than > 140/90, repeat in 1hour.
Refer to M.D. if remains > 140/90.

Eye Exam: 20/100 OD  20/100 OS  20/100 OU  Glass Broken

BPV
QDAY
X7 ℗

II.  TESTING – (LPN or RN)

RESULTS  97
FSBS

Tuberculin Skin Test (q yr)
Date given 3/20/07  Site LFA
Read on 3/22/07 Results 110 mm

Past Positive TB Skin Test  →  Survey Completed
(Chest x-ray if clinical symptoms)   Date_____ Results_____
RPR  (q 3 yrs)   Date 3-28-05  Results NR
EKG (baseline at 35, over 45 q 3 yrs)   3-19-04
Cholesterol (at 35 then q 5 yrs)   3-17-05  — 193
Tetanus/Diptheria  (q 10 yrs)   Last Given 1999  Due 2009
(if done today)   Site given — Dose — Lot # —
Optometry Exam (@ 50 if not already seen)   3-31-05
Mammogram   Date NA Results —
(females @ 40, q 2 yrs/other M.D. order)

III.  PHYSICAL RESULTS – ( RN, Mid-Level, M.D.)

Class (1) 2  3  4  5   Restrictions
Heart   S₁ S₂
Lungs   Clear Bilaterally
Testicular  Breast Exam   self exam taught
Rectal (yearly after 45)   Results
with Hemoccult   Results Refuses
Pelvic and PAP (q 1 yr)   Date NA Results —

Facility Ventress  Nurse Signature C Hunter, RN  Date 3/20/07

M.D. or Mid-Level Signature _____ CRNP  Date 3/29/07

| INMATE NAME | AIS# | D.O.B. | RACE/SEX |
|---|---|---|---|
| Gangle, Norman | 149515 | 3/2/54 | W/M |



**PHS**
PRISON HEALTH SERVICES, INC.

# YEARLY HEALTH EVALUATION

## I.    HISTORY – (LPN or RN)

|  | YES | NO | COMMENT(S) |
|---|---|---|---|
| Weight Change (greater 15 lbs.) | ↑ 17 lbs ✓ | | 205      3-30-05 |
| (Compare Weight Below) | | | Last weight at least 6 months ago |
| Persistent Cough | | ✓ | |
| Chest Pain | | ✓ | |
| Blood in Urine or Stool | | ✓ | |
| Difficult Urination | | ✓ | |
| Other Illnesses (Details) | | ✓ | |
| Smoke, Dip or Chew | | ✓ | |
| ALLERGIES | | ✓ | |

Weight 222 Temp. 98° Height 5'10 Pulse 64 Resp 20 Blood Pressure 134/100

**If greater than > 140/90, repeat in 1hour.**

Eye Exam: 20/200 OD  20/200 OS  20/200 OU

**Refer to M.D. if remains > 140/90.**

RPR✓
Q DAY
×3 (P)

## II.    TESTING – (LPN or RN)

**RESULTS**

Finger stick blood sugar __117__

| | |
|---|---|
| Tuberculin Skin Test (q yr) | Date given 3-14-06 Site RFA |
| | Read on 3/16-06 Results Ø mm |
| Past Positive TB Skin Test → | **Survey Completed** |
| (Chest x-ray if clinical symptoms) | Date _____ Results _____ |
| RPR (q 3 yrs) | Date 2005 Results NR |
| EKG (baseline at 35, over 45 q 3 yrs) | 2004 |
| Cholesterol (at 35 then q 5 yrs) | 2005 |
| Tetanus/Diptheria (q 10 yrs) | Last Given 1999 Due 2009 |
| (if done today) | Site given ____ Dose ____ Lot # ____ |
| Optometry Exam (@ 50 if not already seen) | 2005 |
| Mammogram | Date N/A Results _____ |
| (females @ 40, q 2 yrs/other M.D. order) | |

## III.    PHYSICAL RESULTS – ( RN, Mid-Level, M.D.)

| | | |
|---|---|---|
| Class ①  2  3  4  5 | Restrictions | none |
| Heart | | RRR |
| Lungs | | Clear |
| Breast Exam | | |
| Rectal (yearly after 45) | Results | waiver signed |
| with Hemoccult | Results | |
| Pelvic and PAP (q 1 yr) | Date N/A | Results _____ |

Facility VCF    Nurse Signature M Benquil    Date 3-14-06

M.D. or Mid-Level  Signature Haylow    Date 3/23/06

| INMATE NAME | AIS# | D.O.B. | RACE/SEX |
|---|---|---|---|
| Gangle, Norman | 149515 | 3/2/54 | W/M |



**PRISON HEALTH SERVICES, INC.**

# YEARLY HEALTH EVALUATION

| I. | HISTORY – (LPN or RN) | YES | NO | COMMENT(S) |
|---|---|---|---|---|
| | Weight Change (greater 15 lbs.) | | ✓ | 210'/v   3-11-0✓ |
| | (Compare Weight Below) | | | Last weight at least 6 months ago |
| | Persistent Cough | | ✓ | |
| | Chest Pain | | ✓ | |
| | Blood in Urine or Stool | | ✓ | |
| | Difficult Urination | ✓ | ✓ | |
| | Other Illnesses (Details) | ✓ | | Resp. Problem |
| | Smoke, Dip or Chew | | ✓ | |
| | ALLERGIES | | | |

Weight 205  Temp 97⁸  Height 5'10"  Pulse 64  Resp 20  Blood Pressure 140/90

**If greater than > 140/90, repeat in 1hour.**
**Refer to M.D. if remains > 140/90.**

Eye Exam: 20/200 OD  20/200 OS  20/200 OU

| II. | TESTING – (LPN or RN) | RESULTS |
|---|---|---|
| | Tuberculin Skin Test (q yr) | Date given 3-26-05  Site LFA |
| | | Read on 3/28/05  Results ∅  mm |
| | Past Positive TB Skin Test → | **Survey Completed** |
| | (Chest x-ray if clinical symptoms) | Date ___ Results ___ |
| | RPR (q 3 yrs) | Date 3-21-05  Results ___ |
| | EKG (baseline at 35, over 45 q 3 yrs) | 3-19-04 |
| | Cholesterol (at 35 then q 5 yrs) | 3-16-05 |
| | Tetanus/Diptheria (q 10 yrs) | Last Given 1999  Due 2009 |
| | (if done today) | Site given ___ Dose ___ Lot # ___ |
| | Optometry Exam (@ 50 if not already seen) | |
| | Mammogram | Date N/A  Results N/A |
| | (females @ 40, q 2 yrs/other M.D. order) | |

**III. PHYSICAL RESULTS – ( RN, Mid-Level, M.D.)**

| | | |
|---|---|---|
| Class 1 2 3 4 5 | Restrictions none | |
| Heart | RRR | |
| Lungs | clear | |
| Breast Exam | none | |
| Rectal (yearly after 45) | Results Refused 3/28/05 | |
| with Hemoccult | Results Refused 3/28/05 | |
| Pelvic and PAP (q 1 yr) | Date N/A  Results N/A | |

Facility Ventress  Nurse Signature _____  Date 03-26-05

M.D. or Mid-Level Signature _____ CRNP  Date 3/30/05

| INMATE NAME | AIS# | D.O.B. | RACE/SEX |
|---|---|---|---|
| Gangle, Norman | 149515 | 3/2/54 | W/M |



**PRISON
HEALTH
SERVICES
INCORPORATED**

## INFIRMARY NURSING PROGRESS NOTES

| Date/Time | |
|---|---|
| 3-22-04/1020 | O- Refused MD appt P/T ® jaw et to discuss EKG results |
| | P- Release of liability signed. C. Hunter, LPN |
| 3-26-05 | P- Annual Physical done — TB shot given — appointment for rectal exam    MScanfield |
| 3-28-05/1045 | Inmate refused MD appt. for rectal exam/EKG for annual physical |
| | P- Release of liability signed. —CHunter, LPN |
| 3-14-06 | P- Annual Physical done — TB shot given    MScanfield |
| 3-20-07/0900 | Annual physical complete. TB skin test given LFA. Refused rectal exam for yearly physical. Release of liability signed. — CHunter, RN |

| INMATE NAME (LAST, FIRST, MIDDLE) | DOC# | DOB | R/S | FAC. |
|---|---|---|---|---|
| Gangle, Norman | 149515 | 3/2/54 | W/M | VCF |

PHS-MD-70049

**Complete Both Sides Before Using Another Sheet**

| Date/Time | Inmate's Name: Gaugle, Norman #149515    D.O.B.: 3 / 2 / 54 |
|---|---|
| 3-27-07 | WT. 212  BP 130/86  P59  R20  T988  discuss lab work. |
| | S 53 y/o w⁰ has developed ⊕ PPD. noted at his |
| | annual P.E. Pt also had DPⅡ c̄ some abn lab |
| | including elevated LFTs. He states he had HepA in |
| | past & liver problem because of excess tylenol use. |
| | PMH ? Hep B |
| | ⊕ tatoos |
| | ⊕ IV drugs - states I was a heroin addict |
| | O alert NAD |
| | ⊕ Jaundice |
| | lungs cl |
| | LFTs ng V |
| | legs s̄ Edema |
| | Abd s̄ft s̄ HM |
| | A ⊕ PPD |
| | H/o Hep B |
| | Abn LFTs 3/22/07 |
| | SGOT - 80    SGPT - 71 |
| | PK of 5.9  3/22/07 |
| | P will get Hep A & B + Hep C Ab.  INH ⊕ |
| | start Rifampin instead of Rifampin c̄ |
| | SGOT of 80 & H/o problem c̄ liver |
| | @ this was discussed with pt. as his tx plan. |
| | [signature] |
| 4/4/07 910 | CCC ———————— Hay Daw — |
| 5/2/07 | CCC ———————— Hay Daw — |

HI-40D

~~GEORGIA~~ DEPARTMENT OF CORRECTIONS

RADIOLOGY SERVICES REQUEST AND REPORT

INSTITUTION: *Ventress*

Name: Gringle, Norman

State ID No: 149915

DOB 3-2-54

Race: B    Sex: M

NOTE: PERTINENT CLINICAL INFORMATION AND TENTATIVE DIAGNOSIS MUST BE PROVIDED FOR X-RAY EXAMINATION TO BE PERFORMED

| Requesting Physician/PA/NP | Date of request | Time of request | Routine | Priority | Transportation of special needs |
|---|---|---|---|---|---|
| Peasant | 3-22-07 | | | | |

HISTORY/DIAGNOSIS: (+) PPD — 16 mm — 3-22-07

X Call Report X

### X-RAY REQUEST

| | | | |
|---|---|---|---|
| ABDOMEN/KUB | FINGERS | NAVICULAR VIEW | SOFT TISSUE STUDIES |
| ACROMIO-CLAVICULAR JOINTS (W/WO WEIGHT) | FOOT | ORBITS | STERNUM |
| ANKLE | HAND | OS CALCIS (HEEL) | TEMPORO-MANDIBULAR JOINTS |
| CERVICAL SPINE | HIP | PELVIS | THORACIC SPINE |
| X CHEST PA / LATERAL | HUMERUS | RADIUS/ULNA | TIBIA/FIBULA |
| COCCYX | KNEE | RIBS | TOES |
| CONE DOWN SELLA TURCICA | LUMBAR SPINE | SACRO-ILIAC JOINTS | WRIST |
| ELBOW | MANDIBLE | SCAPULA | ZYGOMA |
| FACIAL BONES | MAXILLA | SHOULDER | ZYGOMATIC ARCH |
| FEMUR | NASAL BONES | SKULL | |

Gangle

### REPORT

PA Chest:  The heart is not enlarged.  The lungs show mildly increased interstitial markings but are otherwise clear.

IMPRESSION: THE CHEST IS UNREMARKABLE EXCEPT FOR INCREASED INTERSTITIAL LUNG MARKINGS.  IF AN ACUTE INFILTRATE IS SUSPECTED FOLLOW UP IS RECOMMENDED.

D & T: 03-26-07  Howard P. Schiele, M.D./km Board Certified Radiologist  (Signature on file)

3/26/07

| X-RAY TECHNOLOGIST'S NAME (PRINT) | X-RAY TECHNOLOGIST'S SIGNATURE | DATE, TIME  EXAM PERFORMED |
|---|---|---|
| | | 3-23-07 |
| RADIOLOGIST'S NAME (PRINT) | RADIOLOGIST'S SIGNATURE | DATE SIGNED |

WHITE-CHART COPY; CANARY-PHYSICIAN'S COPY; PINK-FILE COPY

Facility Name: Ventress Corr. Facility          Month/Year of Charting: 3/07

| Hour | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Rifampin 600mg PO daily x 4mos

9Am

Start Date: 3-27-07     Prescriber: Pearst M.D.
Stop Date: 7-27-07      RX #:

Motrin 600mg TYD x 3days

9A
3P
9P

Start Date: 3-28-07     Prescriber: R. Thomas
Stop Date: 3-31-07      RX #:

Start Date:     Prescriber:
Stop Date:      RX #:

Start Date:     Prescriber:
Stop Date:      RX #:

Start Date:     Prescriber:
Stop Date:      RX #:

Start Date:     Prescriber:
Stop Date:      RX #:

Diagnosis

Allergies: NKDA

Housing Unit: Population
Patient ID Number: 149515
Patient Name:

Nurse's Signature: Johnson LPN     Initial
Nurse's Signature: (signature)     Initial

| Documentation Codes |
|---|
| 1. Discontinued Order |
| 2. Refused |
| 3. Patient out of facility |
| 4. Charted in Error |
| 5. Lock Down |
| 6. Self Administered |
| 7. Medication out of Stock |
| 8. Medication Held |
| 9. No Show |
| 10. Other |

Date of Birth:

| Facility Name: | Ventress Corr. Facility | Month/Year of Charting: | 4/07 |

| Hour | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |

Rifampin 600mg po
daily x 4mos.

Start Date: 3-27-07   Prescriber: Pleasant M.D.
Stop Date: 7-27-07   RX #:

Motrin 600mg
1 TID x 3 days

8A
3P
9P

Start Date: 3-28-07   Prescriber: R. Thomas
Stop Date: 3-31-07   RX #:

Start Date:   Prescriber:
Stop Date:   RX #:

Start Date:   Prescriber:
Stop Date:   RX #:

Start Date:   Prescriber:
Stop Date:   RX #:

Start Date:   Prescriber:
Stop Date:   RX #:

| Diagnosis | Nurse's Signature | Initial | Nurse's Signature | Initial | Documentation Codes |
|---|---|---|---|---|---|
| | | | | | 1. Discontinued Order |
| Allergies  NKDA | | | | | 2. Refused |
| | | | | | 3. Patient out of facility |
| | | | | | 4. Charted in Error |
| | | | | | 5. Lock Down |
| Housing Unit: population | | | | | 6. Self Administered |
| Patient ID Number: 149515 | | | | | 7. Medication out of Stock |
| Patient Name: | | | | | 8. Medication Held |
| | | | Date of Birth: | | 9. No Show |
| | | | | | 10. Other |



**PHS**

PRISON
HEALTH
SERVICES
INCORPORATED

Attachment E, IMPP 10-127
Effective 3-22-91

### DEPARTMENT OF CORRECTIONS

## REFUSAL TO SUBMIT TO TREATMENT

Date: _____11 - 21 -05_____          Time: _____10 30__ A.M. / P.M.

I have been advised by Medical Staff _____(Dr) VCF_____

that it is necessary for me to undergo the following treatment:

_____Hepatitis B Vaccine_____

(Describe Operation Or Treatment)

The effect and nature of this treatment have been explained to me.

Although my failure to follow the advice I have received may seriously imperil my life or health, I

nevertheless refuse to submit to the recommended treatment. I assume the risks and consequences

involved and release the above named Medical Personnel, the _____Ventress_____,

(Name of Facility)

and its agents and employees from any liability.


Inmate: _____Norman Dangle 149515_____   Date: _11/21/05_

Witness: _____A Marsh m_____   Date: _11-21-05_

Witness: _____Ti Smith jr_____   Date: _11/21/05_


**DOC # 010-127-004**

| INMATE NAME (LAST, FIRST, MIDDLE) | DOC# | DOB | R/S | FAC. |
|---|---|---|---|---|
| Dangle, Norman | 149515 | 3/2/54 | W/M | |

PHS-MD-70032                                                     DOC # 010-127-004



**PHS**
PRISON
HEALTH
SERVICES
INCORPORATED

Attachment E, IMPP 10-127
Effective 3-22-91

### DEPARTMENT OF CORRECTIONS

## REFUSAL TO SUBMIT TO TREATMENT

Date: _3 - 14 - 0 6_       Time: _0 745_   ☑ A.M. / P.M.

I have been advised by Medical Staff _Ventress Correctional Facility_

that it is necessary for me to undergo the following treatment:

_No Way - I'm fine_
(Describe Operation Or Treatment)

The effect and nature of this treatment have been explained to me.

   Although my failure to follow the advice I have received may seriously imperil my life or health, I

nevertheless refuse to submit to the recommended treatment. I assume the risks and consequences

involved and release the above named Medical Personnel, the _Ventress_ ,
(Name of Facility)

and its agents and employees from any liability.


Inmate: _Norman Dargle 149515_      Date: _____

Witness: _M Benyfield f_      Date: _3-14-06_

Witness: _B. Cannon PCT_      Date: _3-14.06_


**DOC # 010-127-004**

| INMATE NAME (LAST, FIRST, MIDDLE) _Dargl, Norman_ | DOC# _149515_ | DOB _3-?-74_ | R/S _w/m_ | FAC. _V-C-F_ |
|---|---|---|---|---|

DOC # 010-127-004



PRISON
HEALTH
SERVICES
INCORPORATED

## RELEASE OF RESPONSIBILITY

Inmate's Name: _Gangle, Norman #149515_

Date of Birth: _3-2-54_     Social Security No.: _____

Date: _3-20-07_     Time: _900_ (A.M.)

This is to certify that I, _Norman Gangle_ , currently in
(Print Inmate's Name)

custody at the _Ventress Correctional Facility_ , am refusing to
(Print Facility's Name)

accept the following treatment/recommendations: _rectal exam for yearly_
(Specify in detail)

_physical_

I acknowledge that I have been fully informed of and understand the above treatment(s)/recommendation(s) and the risks
involved in refusing them. I hereby release and agree to hold harmless the City/County/State, statutory authority, all correctional
personnel, Prison Health Services, Inc. and all medical personnel from all responsibility and any ill effects which, may result from this
action/refusal and I personally assume all responsibility for my welfare.

_Norman Gangle 149515_      _C.Hunter, RN_
(Signature of Inmate)**             (Signature of Medical Person)

_A.Matthews lpn_      _V. Jones, Lpn_
(Witness)                (Witness)

**A refusal by the inmate to sign requires the signature of at least one witness in addition to that of the medical staff member.

60115 (5/85)



PATIENT INFORMATION FACT SHEET - TUBERCULOSIS

PPD SKIN TEST POSITIVE -  NEGATIVE CHEST X- RAY - LATENT TB (LTBI)

## WHAT IS Tuberculosis (TB)?

- Tuberculosis is a contagious disease which you can catch by breathing in the germ.
- TB is not easily spread.
- Tuberculosis usually is confined to the lungs, but can infect other parts of the body.
- Just because you have had a positive PPD test, does NOT mean you have active or contagious TB.
- Both active and latent TB are treatable and curable.
- Once you have a positive skin test, you will almost always have a positive skin test.
- You can NOT get TB from a PPD skin test.
- Repeated PPD skin tests do NOT cause TB.

> **A person with "Latent TB Infection (LTBI):**
>
> - Has inactive TB bacteria in his/her body
> - Does not feel sick and is not infectious
> - Cannot spread TB bacteria to others
> - May need treatment for Latent TB infection to prevent active TB

## WHAT SHOULD I DO? Take Action NOW – "Self management" is the key to good health.

- In many cases, treatment for latent TB consists of "watchful waiting."
- The decision to take medication is a serious one and must be thoroughly discussed between you and your doctor.
- The minimum length of time for treatment is 9 months. You must be willing to commit to taking your medication regularly and for the entire time it has been prescribed.
- You must commit to attend all scheduled clinics and have lab work done regularly throughout your treatment.
- Regular blood tests monitor the effects the medicine may have on your liver.
- If you are released from custody and are receiving treatment, you must follow up with the local Health Department to continue your treatment.

## PUT IN A SICK CALL SLIP IF:  You begin to have the following symptoms:

- Unexplained weight loss
- Stomach tenderness
- Unexplained night sweats ( it is not overly hot in your housing area, and no one else is sweating from the heat)
- A cough that lasts for over 3 weeks
- A cough producing sputum or blood

## EMERGENCY!   TELL A CORRECTIONAL OFFICER OR DEPUTY TO CALL MEDICAL IF:

- You develop sudden chest pain
- You are taking medication for LTBI and develop the following symptoms:

  - Unexplained abdominal tenderness
  - Unexplained nausea and vomiting
  - Numbness of the hands or feet
  - Sudden fever

149515

4-4-07

PHS – New 08/06

HCV – Patient Information/Education
Adopted from the Schering-Plough medication guide and labeling document.

## HEPATITIS C VIRUS

The Hepatitis C virus can and does damage the liver. However, the majority of patients never experience symptoms while others can take from 10 to 15 years before symptoms develop. The damage caused by the Hepatitis C virus may range from none to mild, moderate or life threatening. Symptoms may include:

- Fatigue
- Jaundice (yellowing of the eyes)
- Nausea
- Pain in the abdomen
- Fever

- Muscle Aches
- Joint Pain
- Loss of appetite
- Diarrhea
- Vision Loss

## HEPATITIS C TREATMENT

At the present time there is a medication treatment strategy that is FDA approved for the treatment of the Hepatitis C infection: Pegylated Interferon and Ribavirin combination treatment.

Patients are treated for 24-48 weeks and are followed for 24 weeks post-treatment. The goal of treatment is to achieve sustained virologic clearance. Response to treatment is defined as undetectable HCV RNA and normalization of ALT at 24 weeks post-treatment.

It is important to note that there is no data regarding whether Pegylated Interferon treatment will prevent transmission of HCV infection to others. Additionally, it is not known if treatment with Pegylated Interferon will cure Hepatitis C or prevent cirrhosis, liver failure, or liver cancer that may be the result of infection with the Hepatitis C virus. Approximately 10-14% of patients discontinued treatment due to side effects. It is recommended that patients receiving Pegylated Interferon, alone or in combination with Ribavirin, be discontinued from treatment if HCV viral levels do not show an improvement at 12 weeks or are absent at 24 weeks.

## INDICATIONS

Pegylated Interferon is a treatment for some people who are infected with the Hepatitis C virus. However, Pegylated Interferon/Ribavirin combination treatment can have serious side effects that may cause death. Therefore the treatment is not for everyone. Prior to beginning treatment, patients should discuss the risks and benefits so that they are prepared to make an informed decision.

## CONTRAINDICATIONS

Pegylated Interferon/Ribavirin combination treatment is contraindicated in:

- Patients with hypersensitivity to ribavirin or any other component of the product.

- Women who are pregnant, planning to become pregnant or are breast-feeding.
- Men whose female partners are pregnant.
- Patients that have Hepatitis Caused by your immune system attacking your liver or unstable liver disease.
- Patients that have abnormal red blood cells such as sickle-cell anemia or thalassemia major.
- Patients with a history of significant or unstable cardiac disease should not be treated with Pegylated Interferon/Ribavirin combination treatment.

Serious consideration and thought should occur before taking Pegylated Interferon/Ribavirin, is you have any of the following conditions:

| Conditions that may effect Treatment | |
|---|---|
| Depression or anxiety | Alcoholism |
| High blood pressure | Drug abuse or addiction |
| Previous heart attack, or heart problems | Any kind of autoimmune disease |
| Liver problems other than Hepatitis C | Hepatitis B infection |
| HIV infection | Thyroid problems |
| Diabetes | Sleep problems |
| Colitis | Cancer |
| Kidney problems | Body organ transplants |
| Bleeding problems | |

## SIDE EFFECTS

Patients may present with side effects within the first 12 weeks of treatment and many continue to experience adverse events several months after discontinuation of treatment.

In the combination treatment trial, dose reductions due to adverse reactions occurred in 42% of patients receiving Pegylated Interferon. In the Pegylated Interferon/Ribavirin combination trial the most common adverse events were psychiatric which occurred among 77% of the patients and included most commonly depression, irritability, and insomnia. Pegylated Interferon/Ribavirin induced fatigue or headache was also found in approximately two-thirds of patients and induced fever or rigors in approximately half of the patients. Following is a description of the side effects experienced by patients taking Interferon/Ribavirin treatment.

**Mental Health And Suicide -** Pegylated Interferon/Ribavirin therapies may cause mood and behavior problems. Behavioral problems include irritability and depression. Some patients become more aggressive and some think about hurting or killing themselves or others.

**Heart Problems -** Some patients taking Pegylated Interferon/Ribavirin therapies may develop problems with low blood pressure, fast heart rate and very rarely, heart attacks.

**Blood Problems** - Pegylated Interferon/Ribavirin therapies commonly lower two types of blood cells, white blood cells and platelets. The therapies have also been shown to decrease red blood cells, resulting in anemia. Anemia can be dangerous, especially if a person has heart or circulatory problems.

**Body Organ Problems** - Pegylated Interferon/Ribavirin therapies have been shown to cause damage to internal organs. Symptoms of severe abdominal pain can indicate internal organ damage.

**Birth Defects -** Ribavirin may cause birth defects and/or death of the unborn child. Extreme care must be taken to avoid pregnancy in female patients and in female partners of male patients.

**Endocrine Disorders** - Pegylated Interferon causes or aggravates hypothyroidism and hyperthyroidism. Hyperglycemia has been observed in patients treated with Pegylated Interferon. Diabetes mellitus has been observed in patients treated with alpha interferons.

**Colitis** - Fatal and nonfatal ulcerative or hemorrhagic/ischemic colitis have been observed within 12 weeks of the start of alpha interferon treatment. Abdominal pain, bloody diarrhea, and fever are the typical manifestations. The colitis usually resolves within 1-3 weeks of discontinuation of alpha interferons.

**Autoimmune Disorders -** Pegylated Interferon treatment may cause the development or exacerbation of autoimmune disorders such as thrombocytopenia, rheumatoid arthritis, systematic lupus, and psoriasis.

**Pancreatitis** - Fatal and nonfatal pancreatitis has been observed in patients treated with alpha interferon. Pegylated Interferon treatment should be suspended in patients with signs and symptoms suggestive of pancreatitis and discontinued in patients diagnosed with pancreatitis.

## Common, Less Serious Side Effects

| | |
|---|---|
| Flu symptoms: | Including headache, muscle aches, tiredness and fever. |
| Appetite: | Including nausea, loss of appetite, and weight loss. |
| Thyroid: | Some patients develop changes in the function of their thyroid. Symptoms include inability to concentrate, feeling cold or hot all the time, a change in weight and skin changes. |
| Skin reactions: | Redness, swelling, and itching are common at the injection site. |
| Hair Thinning: | Hair loss stops and hair growth returns after treatment is stopped. |

## On-Going Side Effects

A study showed that by the end of the 6-month follow-up period the incidence of ongoing adverse events by body class in the PEG-INTRON 1.5/REBETOL groups was:

- ➢ 33% (psychiatric),
- ➢ 20% (musculoskeletal), and

➢ 10% (for endocrine and for GI).

In addition, approximately 10-15% of patients weight loss, fatigue and headache had not resolved.

## DOCUMENTATION OF EDUCATION

### Education Session 1 - Screening

I understand that I have risk factors for Hepatitis C. I have been provided with the HCV-Patient Information/Education material is adapted from the "Medication Guide" established by Schering-Plough Research Institute. The information in this document has been reviewed with me and I have that the opportunity to ask questions.

| PATIENT'S SIGNATURE | DATE SIGNED |
|---|---|
| PROVIDER'S SIGNATURE | DATE SIGNED |

### Education Session 2 – HCV Positive

I understand that I have tested positive for the Hepatitis C virus. I have been provided with the HCV-Patient Information/Education material is adapted from the "Medication Guide" established by Schering-Plough Research Institute. The information in this document has been reviewed with me and I have that the opportunity to ask questions.

| PATIENT'S SIGNATURE _Norman Daniel 149515_ | DATE SIGNED _4-4-007_ |
|---|---|
| PROVIDER'S SIGNATURE | DATE SIGNED _4-4-007_ |

### Education Session 3 - Treatment

I understand that I am eligible to receive Interferon/Ribavirin treatment. I have been provided with the HCV-Patient Information/Education material is adapted from the "Medication Guide" established by Schering-Plough Research Institute. The information in this document has been reviewed with me and I have that the opportunity to ask questions.

| PATIENT'S SIGNATURE | DATE SIGNED |
|---|---|
| PROVIDER'S SIGNATURE | DATE SIGNED |

## INH/ACTIVE TB CLIN
## Q-month

Name: _Gergle Norman_  DOB: _3-2-54_  AIS#: _149515_  R/S ___ w/m (53)

### PATIENT HISTORY

Date of Diagnosis: _3-26-07_
Current Meds: _Rifampin 600mg qd_____  Compliant (Y) N

| VARIABLE | Date (initial exam) 4/4/07 | | | | | Date 5-2-07 | | | | | Date | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BP/Pulse/RR/T/Wgt | 130/90 | 62 | 18 | 96 | 215 | 123/85 | 59 | 16 | 97.4 | 212 | | | | | |
| Fever/Night Sweats | Ø | / | Ø | | | Ø | / | Ø | | | | / | | | |
| Poor Appetite/Wgt Loss | Ø | / | Ø | | | Ø | / | 1 lb 3# | | | | / | | | |
| Cough/Sputum | Ø | / | Ø | | | Ø | / | Ø | | | | / | | | |
| Hemoptysis | Ø | | Ø | | | Ø | | Ø | | | | | | | |
| Nausea/Vomiting | Ø | | Ø | | | Ø | | Ø | | | | | | | |
| General Appearance | | NAD | | | | NAD | | | | | | | | | |
| Jaundice | | Ø | | | | Ø | | | | | | | | | |
| Nodes | | Ø | | | | Ø | | | | | | | | | |
| Lungs | CTA | | | | | CTA | | | | | | | | | |
| Abdomen | soft | | | | | | | | | | | | | | |

### LABS

| | Date | Date | Date |
|---|---|---|---|
| TB Skin Test | 3· | 3-20-07 | |
| C-Xray/C.T | 3-26-07 / | 3-26-07 / | / |
| LFT q-month | 4-3-07  52/58 | 5-1-07  63/67 | |
| AFB Sputum | | | |
| CBC per order | 3-23-07 | 3-23-07 | |
| Disease Control | Good/Fair/Poor Improved/ Worsened | Good/Fair/Poor Improved/ Worsened | Good/Fair/Poor Improved/ Worsened |

### PLAN

| Patient Edu/Training | pt info Tuberculosis | | |
|---|---|---|---|
| Completed Master Problem Sheet | ✓ | ✓ | |
| Next F/U | 5-2-07 | 6-13-07 | |
| Signature | Ha/wp | Ha, clive | |

| SHORT TERM GOALS | LONG TERM GOALS |
|---|---|
| 1 Sbot < 150 c̄ tx Plan | 1 Ø Smoking |
| 2 Ø plu Ø wt Δ c̄ tx Plan | 2 Rx compliance |

Comments:
4/4/7 Hx ttpc on Rfamp~
5/2/7 on Rfampin daily
c/o Nausea c̄ Eye Δ'n reports
States vision fuzzy all day & will call
also reports fatigue and mental Δ
Described as fuzzy mental alertness.
Will DC Rifampin → flu 2 week

# HEP C CLINIC
## Q 3-6 months

*Gangle*

Name: _Norman_     DOB: _3-2-54_  AIS#: _149515_  R/S _WM (53)_

## PATIENT HISTORY

Date of Hep-C Antibody Positivity: _4/07_
Current Meds: _InfT Rifampin_     Compliant? (Yes)    No
### Risk factors (check all that apply)
(IVDA)  (Alcoholism)  (Tatoos)  (Transfusions)

| VARIABLE | Date (initial exam) | | | | | Date | | | Date | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BP/Pulse/RR/T/Wgt | B/P | 62 | 18 | 96 | 215 | | | | | | |
| Drowsiness/Weakness | Ø | / | Ø | | | | / | | | / | |
| Nauses/vomiting | Ø | / | Ø | | | | / | | | / | |
| Abd pain/swelling | Ø | / | Ø | | | | / | | | / | |
| Blood in stool | Ø | | | | | | | | | | |
| General Appearance | NAD | | | | | | | | | | |
| Icterus/Spiders | Ø | / | | | | | / | | | / | |
| Mental Status/Asterixis | A A0x3 | / | Ø | | | | / | | | / | |
| Heart | R2R | | | | | | | | | | |
| Lung | Ctx | | | | | | | | | | |
| Liver/Ascites | Ø hepatomegaly | Ø | | | | | / | | | / | |
| Edema | Ø | / | Ø | | | | / | | | / | |

## LABS     Date          Date          Date

| | | | |
|---|---|---|---|
| INR | | | |
| DPII per protocol | C3/22/u | | |
| Abd US | | | |
| Liver Biopsy/Genotype | 1 ordered | 1 2 B | / |
| Fe/TIBC/Ferritin | / | / | / |
| Hep BsAg/Hep C VL | ordered | 3,935,580 | / |
| Disease Control | Good/Fair/Poor Improved/Worsened | Good/Fair/Poor Improved/Worsened | Good/Fair/Poor Improved/Worsened |

## PLAN     Date          Date          Date

| | | | |
|---|---|---|---|
| Hep B Vaccination | | | |
| Patient Edu/Training | Dz Process HPC | | |
| Completed Master Problem Sheet | ✓ | | |
| Next F/U | 6m | | |
| Signature | Taylor | | |

## SHORT TERM GOALS / LONG TERM GOALS

| SHORT TERM GOALS | LONG TERM GOALS |
|---|---|
| 1 Ø wt Δ c̄ tx plan | 1 Avoid Drugs & tatoos |
| 2 Ø N/V c̄ Dz process | 2 Ø Smoking |

Comments:
LFT ✓ 4/2/7 52/58
Cont to monitor S/S of HPC
will get VL and Genotype



**PHS**
PRISON
HEALTH
SERVICES
INCORPORATED

## PHYSICIANS' ORDERS

| NAME: Gangle Norman 149515 | DIAGNOSIS (If Chg'd) |
|---|---|
| 149515 | Hep C Viral load And Genotype |
| D.O.B. 3/2/54 | Hep C CCC |
| ALLERGIES: NKDA | |
| Use Last    Date 4/14/07 | ☐ GENERIC SUBSTITUTION IS NOT PERMITTED  H A O comp |

| NAME: Gangle Norman 149515 | DIAGNOSIS (If Chg'd) |
|---|---|
| | |
| D.O.B. 3/2/54 | LFT per protocol x 6 mos |
| ALLERGIES: | V/O Dr. Pleasant / 8 Morphine |
| Use Fourth    Date 4/2/07 | ☐ GENERIC SUBSTITUTION IS NOT PERMITTED |

| NAME: Gangle, Norman | DIAGNOSIS (If Chg'd) |
|---|---|
| #149515 | 600 mgs Ibuprofen, 1 tablet |
| D.O.B. 3/12/54 | tid X 3 days. |
| ALLERGIES: NKDA | |
| Use Third    Date 3/28/07 | ☐ GENERIC SUBSTITUTION IS NOT PERMITTED |

| NAME: Gangle, Norman | DIAGNOSIS (If Chg'd) |
|---|---|
| #149515 | ① Rifampin 600 mg qd X 4 months |
| D.O.B. 3/2/54 | ② Calls to pill Call to get |
| ALLERGIES: NKDA | started |
| Use Second    Date 3/27/07 | ☐ GENERIC SUBSTITUTION IS NOT PERMITTED  Pleasant |

| NAME: Gangle, Norman | DIAGNOSIS |
|---|---|
| #149515 | ① Rifampin |
| D.O.B. 3/2/54 | ② Hep A&B, Also Hep C, Ab. |
| ALLERGIES: NKDA | ③ Start CCC for ⊕ PPD |
| Use First    Date 3/26/07 | ☐ GENERIC SUBSTITUTION IS NOT PERMITTED |



**PRISON
HEALTH
SERVICES**
INCORPORATED

### PHYSICIANS' ORDERS

NAME:

DIAGNOSIS (If Chg'd)

D.O.B.   /   /
ALLERGIES:

Use Last   Date   /   /

☐ GENERIC SUBSTITUTION IS <u>NOT</u> PERMITTED

---

NAME:

DIAGNOSIS (If Chg'd)

D.O.B.   /   /
ALLERGIES:

Use Fourth   Date   /   /

☐ GENERIC SUBSTITUTION IS <u>NOT</u> PERMITTED

---

NAME:

DIAGNOSIS (If Chg'd)

D.O.B.   /   /
ALLERGIES:

Use Third   Date   /   /

☐ GENERIC SUBSTITUTION IS <u>NOT</u> PERMITTED

---

NAME:

DIAGNOSIS (If Chg'd)

D.O.B.   /   /
ALLERGIES:

Use Second   Date   /   /

☐ GENERIC SUBSTITUTION IS <u>NOT</u> PERMITTED

---

NAME: Gangle Norman
149515

DIAGNOSIS

D.O.B. 3/2/54
ALLERGIES: nkna

DC Rifampin
x 2 week
Please allow Im to eat c Diabetics
at Lunch x 1 month

Use First   Date 5/2/07

☐ GENERIC SUBSTITUTION IS <u>NOT</u> PERMITTED

**BioReference**
LABORATORIES

ENTRESS CORRECTIONAL FAC.
79 HWY 239
CLYTON AL, AL   36016

BOOK/CASE:

.0115-9)   Bio-Net Print

-FINAL-   Original Report 03/24/2007

GANGLE, NORMAN

| PATIENT I.D. / ROOM NO. | DOCTOR / GROUP NAME |
|---|---|
| 149515.867 | PEASANT, JOHN |

| J. NO. | DATE COLLECTED | DATE RECEIVED | DATE OF REPORT | AGE | SEX |
|---|---|---|---|---|---|
| 104050886 | 03/22/2007 09:35 AM | 03/23/2007 09:29 | 3/24/2007 02:14 | 53 Y | M |

| Test Description | Result | Abnormal | Reference Range |
|---|---|---|---|

Tests Ordered : DIAGNOSTIC PROFILE II, HEPATIC PROFILE, ,
------------------------------* CHEMISTRY *------------------------------

| Test | Result | Abnormal | Reference Range | Units |
|---|---|---|---|---|
| Total Protein | 7.7 | | 5.9-8.4 | gm/dl |
| Albumin | 4.6 | | 3.2-5.2 | gm/dl |
| Globulin | 3.1 | | 1.7-3.7 | gm/dL |
| A/G Ratio | 1.5 | | 1.1-2.9 | |
| Glucose | 83 | | 70-109 | mg/dL |
| Sodium | 143 | | 133-145 | mmol/L |
| Potassium | | 5.9 HI | 3.3-5.3 | mmol/L |
| Chloride | 104 | | 96-108 | mmol/L |
| CO2 | 21 | | 21-29 | mmol/L |
| BUN | 17 | | 7-25 | mg/dl |
| * Creatinine | 1.3 | | 0.6-1.3 | mg/dl |
| BUN/Creat Ratio | 13.1 | | 10-28 | |
| Calcium | 9.7 | | 8.4-10.4 | mg/dl |
| Uric Acid | | 7.8 HI | 2.4-7.0 | mg/dl |
| Iron | | 165 HI | 30-160 | mcg/dl |
| Bilirubin, Total | 0.6 | | 0.1-1.0 | mg/dl |
| LDH | | 474 HI | 94-250 | u/l |
| Alk Phos | 43 | | 39-120 | u/l |
| AST (SGOT) | | 80 HI | < 37 | u/l |
| Phosphorous | 4.8 HI | | 2.6-4.5 | mg/dl |
| ALT (SGPT) | | 71 HI | < 40 | u/L |
| G-GTP | 21 | | 7-51 | u/L |
| Cholesterol | | 202 HI | < 200 | mg/dl |
| Triglycerides | | 177 HI | < 151 | mg/dl |
| HDL CHOL.,DIRECT | 43 | | >35 | mg/dl |
| HDL as % of Cholesterol | | 21 | | % |
| Chol/HDL Ratio | | 4.7 | | |
| LDL/HDL Ratio | 2.88 | | 0-3.55 | |
| LDL Cholesterol | | 124 HI | < 100 | mg/dL |

****************************************************************************
* GFR, Estimated = 61.35 mL/min/1.73m2
****************************************************************************

Continued on Next Page

Page: 1

ıs Weisberger, M.D.
ATORY DIRECTOR

 **BioReference** LABORATORIES

| | | |
|---|---|---|
| D O C T O R | VENTRESS CORRECTIONAL FAC.<br>379 HWY 239<br>CLYTON AL, AL  36016<br>(A0115-9)   Bio-Net Print | BOOK/CASE:<br><br>-PRELIMINARY- |

| NAME | PATIENT I.D. / ROOM NO. | DOCTOR / GROUP NAME |
|---|---|---|
| GANGLE, NORMAN | 149515.897 | PEASANT, JOHN |

| LAB I.D. NO. | DATE COLLECTED | DATE RECEIVED | DATE OF REPORT | AGE | SEX |
|---|---|---|---|---|---|
| 104113336 | 03/27/2007 10:57 AM | 03/30/2007 09:40 | 4/2/2007 12:56 | 53 Y | M |

| Test Description | Result | Abnormal | Reference Range |
|---|---|---|---|

Tests Ordered : HEPATITIS SCREEN, HEPATITIS A AB, (IGM),
               HEPATITIS C ANTIBODY, ,
       --------------------------* MISCELLANEOUS *-----------------------------

| | | | |
|---|---|---|---|
| HEP. A Ab,IgM | TO FOLLOW | | NEGATIVE |
| HEPATITIS A AB/TOTAL | | Positive | NEGATIVE |
| HBcAB | | Positive | NEGATIVE |
| HBsAg | Negative | | NEGATIVE |
| HEPATITIS C Ab. | | Positive | NEGATIVE |

************************************************************************

NOTE: Results for Hepatitis C Virus Antibody (test# 0812), when
      reported as positive indicates the presence of significant
      antibody levels (defined as a signal to cutoff ratio [s/co]
      of greater than 8.0).  Sera with a high s/co ratio will
      confirm positive in >95% of cases, however <5% of results
      reported as positive may be false-positives. Additional
      serologic testing is available for patients whose anti-HCV
      result is inconsistent with clinical findings. Results that
      are considered borderline will be automatically reflexed for
      RIBA (immunoblot) analysis and reported accordingly. Results
      reported as indeterminate by RIBA indicate the presence of
      only one of the required protein bands or is reactive with
      multiple bands including control protein indicative of
      reactivity with irrelevant recombinant sequences.

                          Partial Report                    Page: 1





**BioReference**
LABORATORIES

| | | | |
|---|---|---|---|
| D O C T O R | VENTRESS CORRECTIONAL FAC.<br>379 HWY 239<br>CLYTON AL, AL  36016 | BOOK/CASE: | |
| | (A0115-9)   Bio-Net Print | -FINAL-   Original Report 04/03/2007 | |

| NAME | PATIENT I.D. / ROOM NO. | DOCTOR / GROUP NAME |
|---|---|---|
| GANGLE, NORMAN | 149515.897 | PEASANT, JOHN |

| LAB I.D. NO. | DATE COLLECTED | DATE RECEIVED | DATE OF REPORT | AGE | SEX |
|---|---|---|---|---|---|
| 104113336 | 03/27/2007 10:57 AM | 03/30/2007 09:40 | 4/3/2007 08:52 | 53 Y | M |

| Test Description | Result | Abnormal | Reference Range |
|---|---|---|---|

Tests Ordered : HEPATITIS SCREEN, HEPATITIS A AB, (IGM),
HEPATITIS C ANTIBODY, ,
------------------------------* MISCELLANEOUS *-----------------------------


| | | | |
|---|---|---|---|
| HEP. A Ab,IgM | Negative | | NEGATIVE |
| HEPATITIS A AB/TOTAL | | Positive | NEGATIVE |
| HBcAB | | Positive | NEGATIVE |
| HBsAg | Negative | | NEGATIVE |
| HEPATITIS C Ab. | | Positive | NEGATIVE |

*********************************************************************

NOTE: Thirty percent of the adult population has positive Hepatitis A
antibody.  Hepatitis A, IgM antibody is positive during the acute
phase.  Hepatitis A, TOTAL is positive during the recovery phase
or is indicative of a past infection.


*********************************************************************

NOTE: Results for Hepatitis C Virus Antibody (test# 0812), when
reported as positive indicates the presence of significant
antibody levels (defined as a signal to cutoff ratio [s/co]
of greater than 8.0).  Sera with a high s/co ratio will
confirm positive in >95% of cases, however <5% of results
reported as positive may be false-positives. Additional
serologic testing is available for patients whose anti-HCV
result is inconsistent with clinical findings. Results that
are considered borderline will be automatically reflexed for
RIBA (immunoblot) analysis and reported accordingly. Results
reported as indeterminate by RIBA indicate the presence of
only one of the required protein bands or is reactive with
multiple bands including control protein indicative of
reactivity with irrelevant recombinant sequences.

                              Final Report                        Page: 1

                                                    4/4/07



**BioReference**
LABORATORIES

| | | |
|---|---|---|
| **D O C T O R** | VENTRESS CORRECTIONAL FAC.<br>379 HWY 239<br>CLYTON AL, AL 36016 | BOOK/CASE: |
| | (A0115-9)  Bio-Net Print | -FINAL- Original Report 04/03/2007 |

| NAME | PATIENT I.D. / ROOM NO. | DOCTOR / GROUP NAME |
|---|---|---|
| GANGLE, NORMAN | 149515.930 | PEASANT, JOHN |

| LAB I.D. NO. | DATE COLLECTED | DATE RECEIVED | DATE OF REPORT | AGE | SEX |
|---|---|---|---|---|---|
| 104149150 | 04/02/2007 10:01 AM | 04/03/2007 09:19 | 4/3/2007 12:58 | 53 Y | M |

| Test Description | Result | Abnormal | Reference Range | |
|---|---|---|---|---|

Tests Ordered : HEPATIC PROFILE, ,
----------------------------* CHEMISTRY *------------------------------

| Test Description | Result | Abnormal | Reference Range | |
|---|---|---|---|---|
| Total Protein | 7.8 | | 5.9-8.4 | gm/dl |
| Albumin | 4.6 | | 3.2-5.2 | gm/dl |
| Globulin | 3.2 | | 1.7-3.7 | gm/dL |
| A/G Ratio | 1.4 | | 1.1-2.9 | |
| Bilirubin, Total | 0.4 | | 0.1-1.0 | mg/dl |
| Alk Phos | 49 | | 39-120 | u/l |
| AST (SGOT) | | 52 HI | < 37 | u/l |
| ALT (SGPT) | | 58 HI | < 40 | u/L |

----------------------------* MISCELLANEOUS *------------------------------

| | | | | |
|---|---|---|---|---|
| BILIRUBIN, DIRECT | 0.1 | | 0.0-0.3 | MG/DL |

*************************************************************************
NOTE: Specimen submitted was SLIGHTLY hemolyzed.
Some results MAY BE affected. Please repeat as needed.

Final Report                                Page: 1

*James Weisberger, M.D.*

481 EDWARD H. ROSS DR.<br>ELMWOOD PARK, NJ 07407<br>1-800-229-LABS



**BioReference**
L A B O R A T O R I E S

| | |
|---|---|
| D O C T O R | VENTRESS CORRECTIONAL FAC.<br>379 HWY 239<br>CLYTON AL, AL   36016 | BOOK/CASE: |
| | (A0115-9)   Bio-Net Print | -FINAL-   Original Report 04/09/2007 |

| NAME | PATIENT I.D. / ROOM NO. | DOCTOR / GROUP NAME |
|---|---|---|
| GANGLE, NORMAN | 149515.953 | PEASANT, JOHN |

| LAB I.D. NO. | DATE COLLECTED | DATE RECEIVED | DATE OF REPORT | AGE | SEX |
|---|---|---|---|---|---|
| 104183481 | 04/04/2007 11:01 AM | 04/05/2007 23:24 | 4/10/2007 06:22 | 53 Y | M |

| Test Description | Result | Abnormal | Reference Range |
|---|---|---|---|

Tests Ordered : HEPATITIS C ANTIBODY, HEP.C RNA/VIRAL LOAD, BDNA,
                HEPATITIS C GENOTYPE, ,
----------------------------* MISCELLANEOUS *------------------------------

| | | |
|---|---|---|
| HEPATITIS C GENOTYPE | TYPE 2b | SEE BELOW |
| HEP.C,RNA,bDNA,QNT~ | 20454612 | <3200 copies/mL |
| HEP.C,RNA,bDNA,QNT~ | 3,933,580 | <615 IU/mL |

*********************************************************************
  Test# 3335 (Hep. C RNA/Viral load,bDNA) performed using Bayer bDNA
  Assay.

*********************************************************************
  Test# 2161 (Hepatitis C Genotype) performed using Bayer Versant
  LIPA Assay.

*********************************************************************
Hepatitis C genotype was evaluated and its performance characteristics
determined by BioReference Laboratories. It has not been cleared or
approved by the FDA, but such clearance or approval is not necessary.
It should not be regarded as investigational or for research. The
laboratory is certified under the Clinical Laboratory Improvement Act
of 1988 (CLIA) as qualified to perform high-complexity clinical testing.

*********************************************************************
NOTE: Hepatitis C Virus Genotype/Subtype assay is able to identify the
following subtypes:
     1a, 1b, 1a/1b, 1, 2a/2c, 2b, 2, 3a, 3b, 3c, 3
     4a, 4b, 4c/4d, 4e, 4f, 4h, 4, 5a, 6a, 10a

                         Final Report                    Page: 1

                              4/18/07

481 EDWARD H. ROSS DR.<br>ELMWOOD PARK, NJ 07407


BioReference
LABORATORIES

| | |
|---|---|
| D O C T O R | VENTRESS CORRECTIONAL FAC.<br>379 HWY 239<br>CLYTON AL, AL   36016<br><br>(A0115-9)   Bio-Net Print | BOOK/CASE:<br><br>-FINAL-  Original Report 04/09/2007 |

| NAME<br>GANGLE, NORMAN | PATIENT I.D./ROOM NO.<br>149515.953 | DOCTOR/GROUP NAME<br>PEASANT, JOHN |
|---|---|---|

| LAB I.D. NO.<br>104183481 | DATE COLLECTED<br>04/04/2007 11:01 AM | DATE RECEIVED<br>04/05/2007 23:24 | DATE OF REPORT<br>4/10/2007 06:22 | AGE<br>53 Y | SEX<br>M |
|---|---|---|---|---|---|

| Test Description | Result | Abnormal | Reference Range |
|---|---|---|---|

Tests Ordered : HEPATITIS C ANTIBODY, HEP.C RNA/VIRAL LOAD, BDNA,
            HEPATITIS C GENOTYPE, ,
- - - - - - - - - - - - - - - - - - - - - - -* MISCELLANEOUS *- - - - - - - - - - - - - - - - - - - - - - -


| | | | |
|---|---|---|---|
| HEPATITIS C GENOTYPE | TYPE 2b | | SEE BELOW |
| HEP.C,RNA,bDNA,QNT~ | 20454612 | | <3200 copies/mL |
| HEP.C,RNA,bDNA,QNT~ | 3,933,580 | | <615 IU/mL |

*****************************************************************************
  Test# 3335 (Hep. C RNA/Viral load,bDNA) performed using Bayer bDNA
  Assay.

*****************************************************************************
  Test# 2161 (Hepatitis C Genotype) performed using Bayer Versant
  LIPA Assay.

*****************************************************************************
Hepatitis C genotype was evaluated and its performance characteristics
determined by BioReference Laboratories. It has not been cleared or
approved by the FDA, but such clearance or approval is not necessary.
It should not be regarded as investigational or for research. The
laboratory is certified under the Clinical Laboratory Improvement Act
of 1988 (CLIA) as qualified to perform high-complexity clinical testing.

*****************************************************************************
NOTE: Hepatitis C Virus Genotype/Subtype assay is able to identify the
following subtypes:
    1a, 1b, 1a/1b, 1, 2a/2c, 2b, 2, 3a, 3b, 3c, 3
    4a, 4b, 4c/4d, 4e, 4f, 4h, 4, 5a, 6a, 10a

                          Final Report                          Page: 1



**BioReference**
L A B O R A T O R I E S

| D O C T O R | VENTRESS CORRECTIONAL FAC.<br>379 HWY 239<br>CLYTON AL, AL  36016 | BOOK/CASE: |
|---|---|---|
| | (A0115-9)   Bio-Net Print | -FINAL-  Original Report 05/01/2007 |

| NAME<br>GANGLE, NORMAN | PATIENT I.D. / ROOM NO.<br>149515.1131 | DOCTOR / GROUP NAME<br>PEASANT, JOHN | | |
|---|---|---|---|---|
| LAB I.D. NO.<br>104416588 | DATE COLLECTED<br>04/30/2007 11:33 AM | DATE RECEIVED<br>05/01/2007 10:20 | DATE OF REPORT<br>5/1/2007 10:44 | AGE<br>53 Y | SEX<br>M |

| Test Description | Result | Abnormal | Reference Range | |
|---|---|---|---|---|

Tests Ordered : HEPATIC PROFILE, ,
---------------------------* CHEMISTRY *------------------------------------

| | | | | |
|---|---|---|---|---|
| Total Protein | 7.6 | | 5.9-8.4 | gm/dl |
| Albumin | 4.4 | | 3.2-5.2 | gm/dl |
| Globulin | 3.2 | | 1.7-3.7 | gm/dL |
| A/G Ratio | 1.4 | | 1.1-2.9 | |
| Bilirubin, Total | 0.5 | | 0.1-1.0 | mg/dl |
| Alk Phos | 45 | | 39-120 | u/l |
| AST (SGOT) | | 63 HI | < 37 | u/l |
| ALT (SGPT) | | 67 HI | < 40 | u/L |

---------------------------* MISCELLANEOUS *------------------------------------

| | | | | |
|---|---|---|---|---|
| BILIRUBIN, DIRECT | 0.2 | | 0.0-0.3 | MG/DL |
| | Final Report | | Page: 1 | |

# EXHIBIT B

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| NORMAN CLARK GANGL (AIS #149515), | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| V. | * | 2:07-CV-350-WHA |
| | * | |
| COMMISSIONER(S) CAMPBELL, et al | * | |
| | * | |
| Defendant. | * | |
| | * | |

## AFFIDAVIT OF JOHN M. PEASANT, M.D.

Before me, Reba J. Currie , a notary public in and for said County and State, personally

appeared JOHN M. PEASANT, M.D., and being duly sworn, deposed and says on oath that the

averments contained in the foregoing are true to the best of his ability, information, knowledge and

belief, as follows:

"My name is John Peasant. I am a medical doctor and am over twenty-one years of age. I am

personally familiar with all of the facts set forth in this affidavit. I have been licensed as a physician

in Alabama since 1974. I have served as the Medical Director for Ventress Correctional Facility in

Clayton, Alabama, since August 1, 2006. At all pertinent times, my employment at Ventress

Correctional Facility has been with Prison Health Services, Inc. ("PHS"), the company which

currently contracts with the Alabama Department of Corrections to provide medical services to

inmates.

Norman Gangl (AIS #149515) is currently incarcerated as an inmate at Ventress Correctional

Facility. I am familiar with Mr. Gangl's medical history and conditions, and have seen and evaluated

him as a patient on numerous occasions. I have also reviewed Mr. Gangl's medical records, certified copies of which are being produced to the Court along with this Affidavit.

Mr. Gangl has been seen and evaluated by the medical and nursing staff, and has been referred to an appropriate care provider and given appropriate care, each time he has registered any health complaints at Ventress. Mr. Gangl is enrolled in the Chronic Care Clinic for symptoms related Hepatitis C and TB where he has been regularly seen and evaluated and has had follow-up appointments.

It is my understanding that Mr. Gangl has made a Complaint in this matter alleging that I forced him to take medication for the treatment of TB. Mr. Gangl has a medical history which is significant for Hepatitis C. Although he tested positive for Hepatitis C, he did not meet the required criteria for treating this condition. Mr. Gangl also tested positive for TB on March 22, 2007. He was started on daily doses of Rifampin on March 27, 2007. Rifampin eliminates the bacteria that causes tuberculosis (TB) and it is required in the treatment of TB.

Based on my review of Mr. Gangl's medical records, and on my personal knowledge of the treatment provided to him, it is my medical opinion that all of his medical conditions and complaints have been evaluated in a timely fashion at Ventress Correctional Facility, and that his diagnosed conditions have been treated in a timely and appropriate fashion. At all times, he has received appropriate medical treatment for his health conditions at Ventress. At no time have I, or any of the medical or nursing staff at Ventress Correctional Facility, denied Mr. Gangl any needed medical treatment, nor have we ever acted with deliberate indifference to any serious medical need of Mr. Gangl. At all times, Mr. Gangl's known medical complaints and conditions have been addressed as promptly as possible under the circumstances."

Further affiant sayith not.

2

_JOHN M. PEASANT, M.D._

STATE OF ALABAMA         )

COUNTY OF __Barbour__       )

Sworn to and subscribed before me on this the __24th__ day of __May__, 2007.

NOTARY PUBLIC
My Commission Expires: __9-8-08__

# EXHIBIT C

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

NORMAN CLARK GANGL, (AIS #149515),                    *

      Plaintiff,                                                    *

                                                                  *

V.                                                                   2:07-CV-350-WHA
                                                                  *

COMMISSIONER(S) CAMBPELL, et al..
                                                                  *

      Defendant.                                                    *

## AFFIDAVIT OF NETTIE BURKS, H.S.A.

**BEFORE ME,** _Reba T. Currie_ , a notary public in and for said County and State, personally appeared **NETTIE BURKS, H.S.A.,** and being duly sworn, deposed and says on oath that the averments contained in the foregoing are true to the best of her ability, information, knowledge and belief, as follows:

"My name is Nettie Burks. I am over the age of twenty-one and am personally familiar with all of the facts set forth in this Affidavit. I have been a licensed, registered nurse in Alabama since 1997. I hold an Associate's Degree in nursing from Wallace Community College in Dothan, Alabama. I have worked as a registered nurse at Ventress Correctional Facility in Clayton, Alabama since 1997. Since November 3, 2003, I have been employed as the Health Service Administrator (H.S.A.) for Ventress Correctional Facility by Prison Health Services, Inc., the company which currently contracts with the Alabama Department of Corrections to provide medical services to inmates.

Prison Health Services, Inc. (PHS) has established a simple two-step procedure for identifying and addressing inmate grievances at Ventress Correctional Facility. If an inmate has a grievance regarding a healthcare issue he must submit to the healthcare unit a grievance form. These are standard forms that may be acquired in the healthcare unit or from an inmate's supervising officer in his dormitory. The grievance form allows an inmate to communicate any healthcare related concern by placing the form in the in house mail system or sick call box to be forwarded to the healthcare unit. I have also been directly handed a grievance form from an inmate. I subsequently review the concern and respond via in house mail.

If the inmate is unsatisfied with my response, he may request a grievance appeal form from the healthcare unit. This form allows an inmate to again voice his concerns relating to the healthcare issue addressed with the grievance form. After the inmate has submitted the formal grievance, I will either respond again in writing, or, if warranted, I will meet with the inmate face-to-face in a final attempt to address his concerns verbally.

It is my understanding that Norman Clark Gangl has filed suit in this matter alleging that PHS has failed to provide him with appropriate medical care. However, Mr. Gangl has failed to exhaust Ventress's informal grievance procedure relating to the receipt of medical care for his alleged condition. Specifically, Mr. Gangl has not submitted all appropriate and required forms. As such, the healthcare unit at Ventress Correctional Facility has not been afforded the opportunity to resolve Mr. Gangl's medical complaints prior to filing suit.

Further affiant sayeth not.

NETTIE BURKS, H.S.A.

STATE OF ALABAMA )
)
COUNTY OF _Barbour_ )

Sworn to and subscribed before me on this the ___22nd___ day of _May_____, 2007.

_Reba J Currie_____

Notary Public

My Commission Expires:

_9-8-08_____

# EXHIBIT D

| **POLICY/PROCEDURE** | Date of Origin: 11/03/03 |
|---|---|
| Prison Health Services, Inc | Date of Previous:<br>Revised Date: 1/1/05<br>Revised Date: 5/18/05<br><br>Page 1 of 1 |
| FACILITY NAME:  Alabama Department of Corrections | COUNTY:<br>STATE:  Alabama |

**TITLE:** Grievance Mechanism for Health Complaints          **NUMBER:** GP011

**REFERENCE: NCCHC** : P-A-11; ACA Standard 1-HC-3A-01

**POLICY**:

It is the policy of PHS to encourage the resolution of inmate concerns regarding the health care system prior to the documentation of a written grievance.  A grievance mechanism addresses inmate's complaints about health services.

**PROCEDURE:**

1.    The Health Administrator will work with the facility administrator to ensure that there is a well-defined procedure for handling inmate grievances and appeals.

2.    When a grievance about health care services is received (inmate grievance), the medical record is reviewed, and if necessary, the inmate is interviewed. A review of the grievance occurs within 3 days after receiving the grievance and answered.

3.    Immediate resolution is expected if the grievance involves the inmate's access to health care. The Warden or Warden's designee will be copied.

4.    Every effort will be made to resolve the inmate's grievance to his/her satisfaction.

5.    If the grievance cannot be resolved to the inmate's satisfaction, the inmate may request an appeal in which case the written grievance will be reviewed through the facility review process and answered within 5 days.

6.    Separate logs will be maintained for grievances and grievance appeals.

7.    Summary review of inmate health care (grievances and grievance appeal logs) are included in the Quality Improvement meetings and identified problems are viewed as opportunities to improve care.